

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Amy J. St. Eve | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 03 C 1175 | **DATE** | 12/23/2004 |
| **CASE TITLE** | Ciesielski vs. Hooters on Higgins | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] Enter Memorandum, Opinion, and Order. The Court denies Defendants' Motion for Judgment as a Matter of Law under Federal Rule of Civil Procedure 50(b) as to the jury's punitive damages award.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | Document Number |
|---|---|---|---|---|
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | DEC 27 2004 | |
| | Notified counsel by telephone. | | date docketed | |
| ✓ | Docketing to mail notices. | | | |
| ✓ | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | |
| TH ✓ | courtroom deputy's initials | | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JOANNA CIESIELSKI, )
)
Plaintiff, )
) Case No. 03 C 1175
v. )
)
HOOTERS MANAGEMENT CORPORATION, )
and HOOTERS ON HIGGINS, INC., )
)
Defendants. )

DOCKETED
DEC 2 7 2004

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

Defendants Hooters Management Corporation and Hooters on Higgins, Inc. (collectively "Hooters") move the Court pursuant to Federal Rule of Civil Procedure 50(b) to grant judgment as a matter of law regarding Plaintiff's punitive damages award. For the following reasons, the Court denies Defendants' motion.

### I. BACKGROUND

On February 18, 2003, Plaintiff Joanna Ciesielski filed a four-count complaint against Defendants alleging a hostile work environment claim, failure to supervise, intrusion upon the seclusion of another, and intentional infliction of emotional distress. The Court granted Defendants' Motion for Summary Judgment as to the three state law tort claims, but denied the motion as to Plaintiff's hostile work environment claim under Title VII. The case then proceeded to trial on the hostile work environment claim. At the close of Plaintiff's presentation of evidence, Hooters moved the Court that Plaintiff should be denied punitive damages as matter of law pursuant to Rule 50(a). The Court took the motion under advisement. On November 23,

2004, after a seven day jury trial, the jury found in favor of Plaintiff and awarded her $25,000 in compensatory damages and $250,000 in punitive damages. Defendants then renewed their motion for judgment as a matter of law pursuant to Rule 50(b). Defendants do not challenge the amount of the punitive damages that the jury awarded, but argue that punitive damages cannot be awarded in the first instance. The Court now turns to whether judgment as a matter of law is appropriate.

## II. LEGAL STANDARDS

### A. Federal Rule of Civil Procedure 50(b)

When ruling on a motion for judgment as a matter of law following a jury verdict, the Court does not re-weigh the evidence presented at trial or make credibility determinations. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). Instead, considering the totality of the evidence, the Court determines whether the jury was presented with a "legally sufficient amount of evidence from which it could reasonably derive its verdict." *Massey v. Blue Cross-Blue Shield of Illinois*, 226 F.3d 922, 924 (7th Cir. 2000). In other words, the Court must determine whether any rational jury could have found for the Plaintiff. *Harvey v. Office of Banks & Real Estate*, 377 F.3d 698, 707 (7th Cir. 2004). In determining a motion under Rule 50(b), the Court views the evidence and all reasonable inferences in a light most favorable to the party who prevailed under the verdict. *Reeves*, 530 U.S. at 150-51. Courts apply this standard stringently in discrimination cases because witness credibility is often crucial to the jury's determination. *See Gile v. United Air Lines*, 213 F.3d 365, 372 (7th Cir. 2000) (Rule 50(b) movant assumes "herculean burden").

**B. Punitive Damages Pursuant to 42 U.S.C. § 1981a**

Title VII allows for punitive damages awards when a plaintiff demonstrates that her employer engaged in discrimination "with malice or with reckless indifference to the federally protected rights of an aggrieved individual." 42 U.S.C. § 1981a(b)(1). The Supreme Court has articulated a three-part framework for determining whether punitive damages are appropriate under Section 1981a. *Kolstad v. American Dental Ass'n*, 527 U.S. 526, 545, 119 S.Ct. 2118, 144 L.Ed.2d 494 (1999); *Bruso v. United Air Lines, Inc.*, 239 F.3d 848, 857 (7th Cir. 2001). First, a plaintiff must demonstrate that the defendant acted with knowledge that its actions may have violated federal law. *Kolstad*, 527 U.S. at 536; *Bruso*, 239 F.3d at 857. A plaintiff can establish this requirement by demonstrating that the relevant employees knew or were familiar with anti-discrimination laws and the employer's anti-discrimination policies. *Bruso*, 239 F.3d at 858.

Second, the plaintiff must establish a basis for imputing liability to the employer. *Kolstad*, 527 U.S. at 539. A plaintiff establishes this element by demonstrating that the employees who discriminated against her were managerial agents acting within the scope of their employment. *Id.; Bruso*, 239 F.3d at 858. Whether an employee acts in a managerial capacity is a fact-intensive inquiry based on the authority the employer gives the employee, the employee's discretion, and the manner in which the employee carries out his duties. *Kolstad*, 527 U.S. at 543. Such an employee must be "important," but need not be top management or the company's officers or directors. *Id.*

Even if these two requirements are met, an employer may avoid liability for punitive damages if it can establish that it engaged in a good faith effort to implement an anti-discrimination policy. *See id.* at 544-45; *Bruso*, 239 F.3d at 858. The existence of an anti-

3

discrimination policy alone, however, is insufficient to fulfill this requirement. *Bruso*, 239 F.3d at 858-59. The employer must also engage in good faith efforts to comply with Title VII after it becomes aware of any discrimination complaints. *See Lamply v. Onyx Acceptance Corp.*, 340 F.3d 478, 483 (7th Cir. 2003). This requirement exists so that employers do not insulate themselves from punitive damages by simply implementing anti-discrimination policies without actually enforcing them. *See Bruso*, 239 F.3d at 858-59.

## III. ANALYSIS

### A. Requisite Mental State

Under the first element of the *Kolstad* three-part framework, Ciesielski must demonstrate that Hooters acted with the requisite mental state, that is, with knowledge that its actions may have violated federal law. *See Kolstad*, 527 U.S. at 536. Ciesielski can establish this element by demonstrating that the relevant employees knew or were familiar with anti-discrimination laws and Hooters' anti-discrimination policies. *See Bruso*, 239 F.3d at 858.

At trial, there was testimony that every new Hooters' employee received an employee manual containing Hooters' policy prohibiting sexual harassment in the workplace. (Trial Tr. at 471-72, 612; Def.'s Ex. 27.) Hooters also made its employees aware that they were subject to disciplinary actions for violations of the non-harassment policy. (Trial Tr. at 868-69.) There was also undisputed trial testimony that Hooters' management employees participated in annual training programs that addressed sexual harassment in the workplace. (*Id.* at 116, 119.) Managers Douglas Gleichner, Jimmy Rabbit, Arlen Chung, Lisa Cooper, and Clint Unrue all testified that they were required to attend annual sexual harassment seminars in which Hooters trained them about unfair labor practices, including claims of discrimination and harassment.

4

(*Id.* at 116-119, 250-52, 393-95, 472-475, 819-22.)

Based on this trial evidence and viewing the evidence in a light most favorable to Ciesielski, *see Reeves,* 530 U.S. at 150-51, the Court concludes that there was sufficient evidence that would enable a reasonable jury to determine that these managers acted with the requisite mental state as required under the *Kolstad* framework. *See Bruso,* 239 F.3d 859-60. Because these managers were familiar with Hooters' non-harassment policy and attended annual sexual harassment training seminars, a reasonable jury could have concluded that these managers were familiar with Title VII and must have been aware of the possibility that Ciesielski's complaints concerning comments and touching by co-workers and managers, plus the appearance and recurrence of holes in the changing room wall, would violate Title VII. *See id.* at 860.

### B. Managerial Agents Acting Within Scope of Employment

The next *Kolstad* element requires plaintiffs to establish a basis for imputing liability to the their employer. *Kolstad,* 527 U.S. at 539. To establish this element, plaintiffs are required to demonstrate that the employees who discriminated against them were managerial agents acting within the scope of their employment. *Id.* In making this determination, the fact finder reviews the employees' authority and discretion and how the managerial employees carry out their duties. *Id.* at 543; *Bruso,* 239 F.3d at 858. As such, whether an employee is acting in a managerial capacity is a fact-intensive inquiry. *Kolstad,* 527 U.S. at 543; *Bruso,* 239 F.3d at 858.

Defendants argue that because the alleged offenders were assistant managers, except Lisa Cooper who was the General Manager, there is a serious question whether these individuals are managerial agents under the *Kolstad* standard. Indeed, as Hooters points out, the Eleventh Circuit has concluded that managerial agents must be high up in the corporate hierarchy in order

to establish a basis for punitive damages. *See Dudley v. Wal-Mart Stores, Inc.*, 166 F.3d 1317, 1323 (11th Cir. 1999). This standard, however, is not the law of this Circuit or supported by the Supreme Court's decision in *Kolstad*. In fact, the Eleventh Circuit decided *Dudley* a few months before the Supreme Court's decision in *Kolstad*. Accordingly, the Court turns to *Kolstad* and Seventh Circuit case law for guidance in determining this requirement.

In *Kolstad*, the Supreme Court surmised that a good definition of what constitutes "managerial capacity" does not exist. *Kolstad*, 527 U.S. at 543. The Supreme Court explained that a managerial agent must be "important," but need not be top management or the company's officers or directors. *Id.* Although the Seventh Circuit has referred to managerial agents in this context as "upper management," the definition of managerial agent under the *Kolstad* standard remains imprecise. *See Lamply*, 340 F.3d at 485. Thus, the Court examines whether there was sufficient trial evidence for a reasonable jury to conclude that the relevant managers were acting in a managerial capacity by looking to their discretion and authority and how they carried out their job responsibilities as *Kolstad* directs. *See Kolstad*, 527 U.S. at 543.

At trial, the jury heard evidence about the assistant and general managers' authority and discretion at Hooters on Higgins. Not only did the assistant managers run the day-to-day operations at Hooters on Higgins, there was trial evidence that the assistant managers and General Manager, Lisa Cooper, could interview and hire personnel. (Trial Tr. at 49, Pl.'s Ex. 55.) The assistant managers would set schedules, solve problems with customer orders, and resolve staff conflicts. (Trial Tr. at 50.) Further, the assistant managers and General Manager Cooper could reprimand and discipline employees through "Employee Counseling Reports" and absentee and discipline reports. (*Id.* at 58-59, 477; Pl.'s Ex. 47.) General Manager Cooper,

however, had the final discretion in disciplining an employee. (Trial Tr. at 58.)

In addition, there is trial evidence that Hooters designated Assistant Managers Gleichner, Unrue, Rabbitt, and Chung to receive and act on sexual harassment complaints. (*Id.* at 98, 108-09, 272-73, 392, 475.) The jury also heard evidence that General Manager Cooper, and not the district manager or area manager, had the final discretion in resolving sexual harassment complaints. (*Id.* at 831-32.)

When ruling on a motion for judgment as a matter of law following a jury verdict, it is not the Court's role to re-weigh the evidence or make credibility determinations. *See Reeves*, 530 U.S. at 150. Instead, the Court must determine whether any rational jury could have found for Ciesielski. *See Harvey*, 377 F.3d at 707. Reviewing this trial evidence and all reasonable inferences in a light most favorable to Ciesielski, *see Reeves*, 530 U.S. at 150-51, the Court concludes that there was a sufficient evidentiary basis for the jury to conclude that Unrue, Rabbitt, Chung, Gleichner, and especially Cooper, had the requisite discretion and authority to make them managerial agents under the *Kolstad* standard.

### C.   Hooters' Anti-Discrimination Policy

Because a reasonable or rational jury could have found that Ciesielski established the first two *Kolstad* factors, the Court turns to whether there was sufficient trial evidence for a reasonable jury to conclude that Hooters engaged in a good faith effort to implement an anti-discrimination policy. *See Kolstad*, 527 U.S. at 544-45. As discussed above, Defendants point to undisputed testimony that Hooters had a non-harassment policy. Evidence in the record reveals that at the outset of her employment, Hooters gave Ciesielski a new hire package containing the Hooters' non-harassment policy and the new hire manual, both of which set forth

7

Hooters' policies regarding sexual harassment. (Trial Tr. at 1184; Def.'s Ex. 27.) The "Statement on Harassment" contained in the employee handbook provided details of the types of conduct that constituted harassment, as well as the complaint procedure. (Trial Tr. at 867-88; Def.'s Ex. 27.) In addition, Hooters' managers participated in annual training programs addressing sexual harassment in the workplace. (Trial Tr. at 116, 119.) Hooters' President and CEO, Neil Kiefer, testified that Hooters required all managers, including managers at the Hooters on Higgins, to attend sexual harassment seminars every year. (*Id.* at 869-70). According to Kiefer, Hooters had a procedure to address harassment complaints, including an employee's right to contact him directly. (*Id.* at 873.) Based on this undisputed testimony, a reasonable jury could have found that Hooters had a formal anti-discrimination policy.

Although the implementation of a formal anti-discrimination policy is relevant in evaluating whether Hooters made a good faith effort to comply with Title VII, the Court must also determine whether there was sufficient evidence for a jury to believe that Hooters did not engage in a good faith effort to comply with Title VII after it became aware of Ciesielski's sexual harassment complaints. *See Lamply*, 340 F.3d at 483. At trial, the jury heard testimony that after complaints were made about the recurring holes in the changing room walls, Hooters' management did not respond in a timely fashion. For instance, Assistant Manager Jimmy Rabbitt testified that after some "Hooters Girls"[1] complained to him about the holes in the dressing room wall, he reported the holes to one of his bosses. (Trial Tr. at 308.) Ciesielski testified that in May 2001 she reported the holes in the changing room wall to Rabbitt

---

[1] Plaintiff and other Hooters' employees testified that they refer to the women who work at Hooters as "Hooters Girls."

immediately after she discovered them. (*Id.* at 1079.) At that time, Ciesielski also complained to Rabbit about the kitchen staff's sexual comments and that Rabbitt himself should stop touching the "Hooters Girls." (*Id.* at 1080.) Ciesielski further testified that a few weeks later she attended a "jump start" meeting with other "Hooters Girls" at which Lisa Cooper, the General Manager, also attended. *(Id.* at 1083.) At this meeting, the "Hooters Girls" complained to Cooper about the holes in the changing room and about the kitchen staff's sexual comments and behavior. (*Id.* at 1083-85.) After that, Ciesielski complained to Cooper again explaining that it was inconvenient to change in the women's washroom because no one had repaired the holes in the changing room. (*Id.* at 1086-88.) Furthermore, another Hooters employee, Melissa Frankfort, testified that she notified Assistant Manager Clint Unrue that there was a hole in the changing room wall in May 2001. (*Id.* at 948-50.)

Trial evidence reveals that the first hole was sometimes stuffed with a paper towel, toilet paper, or pantyhose. (*Id.* at 1440, 1450.) The repairman testified, however, that he did not fix the hole with drywall until July 21, 2001, which was approximately three months after Ciesielski and Frankfort, among others, complained of the first hole. (*Id.* at 524; Pl.'s Ex. 20.) The repairman also testified that he usually fixed items on his "to-do list" within a matter of days after being notified. (Trial Tr. at 1088.)

Ciesielski found a second set of holes in the changing room wall in August or September 2001 and complained to General Manager Cooper at that time. (*Id.* at 1109-10.) Instead of handling the complaint herself, Cooper instructed Ciesielski to write a note to the maintenance repairman. (*Id.* at 1111.) The repairman fixed the hole four days after Ciesielski asked him to do so. (*Id.* at 1112.) Melissa Frankfort corroborated Ciesielski's testimony concerning the second

9

hole in the changing room wall. (*Id.* at 953-56.) There is trial testimony, however, that a third set of holes appeared around January 2002, where they remained for approximately two months after the holes were reported to Assistant Manager Doug Gleichner. (*Id.* at 959-61, 1119-20.)

General Manager Cooper testified that there was no investigation into the original hole in the changing room walls. (*Id.* at 776.) Cooper testified that instead of interviewing the staff and others who had access to the building, she thought patching the hole was the most efficient way to rectify the situation. (*Id.*) Her further testimony reveals, however, that no investigation took place after the second or third set of holes appeared. (*Id.* at 778.) In fact, she testified that she did not report the holes in the changing room walls to anyone else in management because she did not feel like there was anything to report. (*Id.* at 740.)

There is additional evidence in the trial record that the kitchen staff and assistant managers made sexual comments and touched other Hooters' employees. (*Id.* at 1452.) For example, "Hooters Girls" complained about the kitchen staff's sexual comments and behavior to Assistant Manager Unrue in May 2001. (*Id.* at 733.) Melissa Frankfort testified that Assistant Manager Jimmy Rabbitt touched other employees, such as tickling them or patting them on the butt. (*Id.* at 966.) In fact, after Rabbitt had touched Frankfort on the butt, she asked him to stop touching her. (*Id.* at 967.) Frankfort also testified that because it took Hooters months to fix the holes in the changing room walls, she felt uncomfortable working at Hooters and eventually left her job there. (*Id.* at 968.)

Based on this evidence in the trial record, the jury could have believed that after Ciesielski and other "Hooters Girls" complained about the sexual comments, touching, and holes in the changing room walls, management such as Cooper, Gleichner, Unrue, and Rabbitt did not

cure the problem. As such, viewing the facts and drawing all reasonable inferences in favor of Ciesielski, *see Harvey*, 377 F.3d at 707, the jury could have concluded that Hooters failed to engage in a good faith effort to comply with Title VII after it became aware of Ciesielski's complaints of the recurring holes in the changing room walls, and the sexual comments and touching by other Hooters' staff. *See Lamply*, 340 F.3d at 483.

In sum, there was sufficient evidence presented at trial for the jury to conclude that punitive damages pursuant to the *Kolstad* standard were appropriate under the circumstances.

## IV. CONCLUSION

For these reasons, the Court denies Defendants' Motion for Judgment as a Matter of Law pursuant to Federal Rule of Civil Procedure 50(b).

Dated: December 23, 2004.

**ENTERED**

_____
AMY J. ST. EVE
United States District Judge